775 F.Supp. 1227 (1991)
DANELLA SOUTHWEST, INC., Plaintiff,
v.
SOUTHWESTERN BELL TELEPHONE COMPANY, Defendant.
No. 88-0578-C-5.
United States District Court, E.D. Missouri, E.D.
October 16, 1991.
*1228 *1229 Thomas F. Jones, Clayton, Mo., John E. Price and Joseph D. Sheppard, Woolsey, Fisher, Whiteaker & McDonald, Springfield, Mo., for plaintiff.
Thad Hollie, Jr., Southwestern Bell Telephone Co., St. Louis, Mo., for defendant.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff Danella Southwest, Inc. is a corporation engaged in the construction and excavation business. Defendant Southwestern Bell Telephone Company is a corporation engaged in the business of providing telephone service in several states including Missouri. Defendant contracted with plaintiff to excavate and remove dirt that, unknown to either party, was contaminated with 2,3,7,8 tetraclorodibenzo-p dioxin ("dioxin"). This action arises from a dispute between plaintiff and defendant as to their respective liability for the cost of containing the dioxin-contaminated dirt.
Plaintiff filed a three count second complaint against defendant. In Count I plaintiff seeks a declaration that it is not liable to defendant under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613, for contribution of the costs incurred by defendant in containing the dioxin-contaminated dirt. In Count II plaintiff seeks to hold defendant liable for a breach of contract. Alternatively, plaintiff seeks to hold defendant liable on the theory of promissory estoppel. In Count III plaintiff seeks to hold defendant liable for a prima facie tort.
Defendant filed a four count second amended counterclaim against plaintiff. In Count I defendant seeks to hold plaintiff liable for a breach of contract. In Count II defendant seeks indemnification. In Count III defendant seeks to hold plaintiff liable for negligence. In Count IV defendant seeks contribution from plaintiff under CERCLA for all costs incurred by defendant in containing the dioxin-contaminated dirt.
This action was tried before the Court on September 10, September 11, September 12, September 13, and September 14, 1990. The Court, having considered the pleadings, *1230 testimony of witnesses, and documents admitted into evidence, hereby makes the following findings of fact and conclusions of law as required by Fed. R.Civ.P. 52.

I. Findings of Fact
James Danella is the sole owner of a holding company that owns plaintiff and fifteen other construction companies operating in thirty states. The principal business of Mr. Danella's construction companies is digging trenches and laying cable for power companies. Mr. Danella's entire enterprise employs between 1,500 and 1,800 employees and has over 3,500 pieces of equipment.
Defendant approached Mr. Danella after learning of his excellent reputation and informed Mr. Danella that there was a lot of work for a good contractor in the State of Missouri. Defendant invited Mr. Danella to set up an operation in Missouri and promised him that defendant would have enough work to keep ten work crews busy. Defendant did not state how long it would offer work to Mr. Danella's operation. Mr. Danella accepted defendant's invitation and incorporated plaintiff in the State of Missouri in late 1984. Mr. Danella spent 2½ million dollars in start-up costs for plaintiff.
Defendant utilizes continuing unit price agreements with all of the contractors that perform excavation and construction work for it. In a continuing unit price agreement defendant and the contractor agree to a schedule of prices, i.e., the hourly cost for the use of a backhoe, the hourly wage for a backhoe operator for any excavation or construction work to be done in a designated area. The continuing unit price agreement sets forth a period, generally one year, in which such schedule of prices is effective. When defendant provided a job for the contractor in the area covered by the continuing unit price agreement, the contractor would do the job for the prices set forth in the continuing unit price agreement. The continuing unit price agreements contain other provisions that govern the relationship between defendant and the contractor. In paragraph 1, the continuing unit price agreements provide:
The Telephone Company does not commit itself to order any specific quantity of work under this agreement and may have the same or similar work performed by its own employees or other contractors; but, so long as this agreement continues in existence, the Contractor agrees to perform for the Telephone Company, at the scheduled prices and in the geographic locations listed in the Continuing Unit Price Schedule attached hereto and incorporated herein by this reference, such work as is specified in job requests as may be issued from time to time by the Telephone Company.
In paragraph 4 the continuing unit price agreements provide:
This agreement may be terminated by either party giving thirty days written notice to the other party. Jobs in progress at the time of termination will be continued under this agreement until completed by the Contractor and accepted by the Telephone Company.
After Mr. Danella set up plaintiff in Missouri, plaintiff entered into continuing unit price agreements with defendant for the purpose of laying cable. On July 9, 1985 plaintiff and defendant entered into a continuing unit price agreement whereby plaintiff would bury cable and service wire for defendant in the area designated as Manchester North. The area of Manchester North includes the city of Eureka, Missouri. On February 12, 1986 defendant asked plaintiff to dig a trench and place buried cable along North Street in Eureka, Missouri. Defendant considered the job to be of an urgent nature.
The North Street site in Eureka is approximately one mile from Times Beach, Missouri. Prior to 1982 an asphalt contractor sprayed dioxin-contaminated waste oils on the streets in Times Beach, Missouri. In 1982 the residents of Times Beach were evacuated due to dioxin contamination. Prior to 1984 dioxin-contaminated waste oil was also sprayed on East North Street in Eureka, Missouri. In 1984 the Environmental Protection Agency ("EPA") determined *1231 that the shoulders of East North Street were contaminated by dioxin with levels up to 6 parts per billion ("ppb").[1] The EPA placed a layer of bituminous pavement over the contaminated area on East North Street in order to contain the dioxin and mitigate the possible hazard at the site.
From February 11, 1986 to February 13, 1986 William Dye, an employee of defendant, prepared and mailed an application for a permit to Eureka City Hall. In the permit defendant requested permission to
Place buried cable along West North Street as shown on the attached work prints. Saw cut and restore 357 feet asphalt street.
Although the permit only mentioned excavation on West North Street, the map attached to the permit shows that the excavation extended from West North Street onto East North Street. The application for a permit was approved by Jim Branscum, the building commissioner of the City of Eureka. On February 19, 1986 Ernie Flora, an employee of plaintiff, visited Mr. Branscum at Eureka City Hall and picked up the approved permit. It was plaintiff's responsibility to arrange for a place to dump the excavated dirt. While at Eureka City Hall, Mr. Flora asked Mr. Branscum if there was any place available to dump the excavated dirt. At that time Mr. Mark Brummit intervened and gave permission to dump the excavated dirt on property leased by Mr. Brummit and owned by Mr. Russell J. Schwarz. The property, located on Williams Road in Eureka, was formerly used as a gas station. There was no mention of dioxin during this conversation between Mr. Branscum, Mr. Flora, and Mr. Brummit.
The job was to be performed by plaintiff pursuant to the continuing unit price agreement in effect since July 9, 1985 for the Manchester North area and Order No. 0610105. The work was performed by plaintiff between February 24, 1986 and March 3, 1986. Plaintiff was paid approximately $30,000.00 to complete the job. Kelly King was plaintiff's foreman at the North Street site. As foreman Mr. King was responsible for the supervision of plaintiff's work crew.[2] Mr. King was also responsible for contacting utility companies to determine the locations of buried water, electric, gas, and sewer lines.[3] Mr. King visited utility companies to obtain up-to-date information because the maps supplied by utility companies were often inaccurate, and if plaintiff inadvertently damaged or ruptured a utility line or cable, plaintiff paid to fix it. Before plaintiff began excavation on North Street Mr. King visited James Thomas Stark, an employee of the City of Eureka Water Department, to ascertain where water lines were located under North Street.
Toward the completion of the North Street job plaintiff learned that it had been digging in dioxin-contaminated dirt. There is a factual dispute as to who notified Mr. King that the excavated dirt on East North Street was contaminated with dioxin. Mr. Stark testified that he notified Mr. King of the contamination when he revisited the site after plaintiff inadvertently ruptured a water line on East North Street during excavation. Mr. King testified, however, that he learned of the dioxin contamination *1232 from the mayor of Eureka after the rupture of the water line.
At the time plaintiff learned of the dioxin contamination, plaintiff had completed excavation of the trench and had laid the pipe and cable. Furthermore, plaintiff had hauled the last pile of dioxin-contaminated dirt to the Williams Road site, and had begun backfilling the trench with gravel. After plaintiff learned of the dioxin contamination, plaintiff ceased its operations and called Thomas Goughenour, a construction supervisor employed by defendant.[4] William Ruck, the employee of plaintiff who hauled dirt away from the North Street site and dumped it on the Schwarz property, was asked by an EPA employee to identify the piles of dirt that had come from the East North Street project. Mr. Ruck identified approximately three piles. Mr. King fenced in these piles and covered them with plastic.
On September 23, 1986 the EPA issued Administrative Order No. 86-F-0009 to plaintiff and defendant requiring them to prepare and carry out a plan to manage and contain the dioxin-contaminated soil at their expense. On October 22, 1987 plaintiff and defendant entered into an Administrative Consent Order with the EPA whereby the parties agreed to prepare and perform a plan to contain the dioxin-contaminated soil in a secure on-site storage facility. Defendant subsequently paid for the cost of building the structure to contain the dioxin. Defendant also paid Mr. Schwarz for his property and paid Mr. Schwarz's legal fees.[5] Defendant expended a total of $223,610.75 in containing the dioxin-contaminated dirt in accordance with the Administrative Consent Order signed by plaintiff and defendant.
Defendant sought for plaintiff to contribute to the containment cost of the dioxin-contaminated dirt. Plaintiff refused to contribute on the ground that the excavation of the dioxin-contaminated dirt was not its fault. When defendant realized that negotiations over contribution for the containment costs were futile, defendant decided to stop doing business with plaintiff.
On September 30, 1987 defendant canceled all of plaintiff's outstanding continuing unit price agreements and informed plaintiff that it would no longer accept any bids from plaintiff for future work. The termination of the outstanding continuing unit price agreements was effective October 30, 1987. Defendant cited as a reason for the termination "quality and coordination problems." Plaintiff, however, believes that defendant terminated its continuing unit price agreements and refused to do further business in retaliation for plaintiff's refusal to contribute to the containment costs. Plaintiff had a job in progress on seven of the continuing unit price agreements. Defendant permitted plaintiff to complete the jobs in progress, accepted the completed work on those jobs, and paid plaintiff.
Although plaintiff came to Missouri in order to do work for defendant, plaintiff expanded its business to do work for Continental Telephone ("ConTel"). Plaintiff also did a small amount of business for other customers. After defendant terminated the continuing unit price agreements with plaintiff, plaintiff was forced to go out of business in Missouri because its business with other clients in Missouri was insufficient to justify its existence here.
The EPA and the Missouri Department of Natural Resources ("MDNR") prepared lists of confirmed dioxin sites. The MDNR periodically sent defendant a list of confirmed dioxin sites. Plaintiff, however, did not receive such lists. Defendant entered dioxin sites from this list into a computer data base. If a map of a particular service area was requested, the printout would reveal whether the service area was the location of a confirmed dioxin site. The EPA designated the East North Street site as a dioxin site in 1984. The MDNR added the North Street site as a confirmed dioxin site on January 5, 1984. There is no indication *1233 that defendant received a list designating East North Street as a confirmed dioxin site prior to plaintiff's excavation of the dioxin-contaminated dirt.[6]

Count I of Plaintiff's Complaint and Count IV of Defendant's Counter-claim  Contribution under CERCLA
Defendant paid for the containment of the dioxin-contaminated dirt. In Count IV of defendant's counterclaim it seeks contribution for plaintiff for the cost of the containment. In Count I of plaintiff's complaint it seeks a declaration that plaintiff is not liable for contribution of the containment costs of the dioxin-contaminated dirt.
Congress passed CERCLA, 42 U.S.C. § 9601 et seq., in 1980 to facilitate the cleanup of hazardous waste disposal sites. Exxon Corp. v. Hunt, 475 U.S. 355, 359-360, 106 S.Ct. 1103, 1107-1108, 89 L.Ed.2d 364 (1986). CERCLA was a response to the threat to public health posed by the widespread use and disposal of toxic materials. Its purpose was "to ensure the prompt and effective cleanup of waste disposal sites, and to assure that parties responsible for hazardous substances bore the cost of remedying the conditions they created." Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454, 1455 (9th Cir.1986) (citing Cong. Record 31964 (statement of Rep. Florio)).
Under § 107 of CERCLA, 42 U.S.C. § 9607, the government held plaintiff and defendant jointly and severally liable for the containment costs of the dioxin contaminated dirt. Defendant expended $223,610.75 to contain the dioxin-contaminated dirt. Although defendant sought a contribution from plaintiff, plaintiff refused to pay any part of the containment costs. Under § 113 of CERCLA, 42 U.S.C. § 9613, Congress expressly recognized a right of contribution under the statute.[7] Superfund Amendment and Reauthorization Act of 1986 ("SARA"), Pub.L.No. 99-499, § 113, 100 Stat. 1613, 1647 (1986).
As amended and as relevant here, § 113 provides:
Contribution
Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal Law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 or section 9607 of this title.
42 U.S.C. § 9613(f)(1). Under Section 113 the Court must first find that plaintiff was a "responsible party" under § 107(a). Section 107(a) defines a responsible party as
(1) the owner and operator of a vessel or facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous waste substances, and
(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration *1234 vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance....
42 U.S.C. § 9607(a). It is clear that plaintiff is a "responsible party" under § 107(a)(4). Plaintiff transported the dioxin-contaminated dirt from East North Street to the Schwarz property on Williams Road, a site selected by plaintiff. Finding that plaintiff is a "responsible party" and thus liable for contribution under § 107(a) does not mean that plaintiff is liable for contribution under CERCLA. Environmental Transp. Systems, Inc. v. Ensco, Inc., 763 F.Supp. 384, 388 (C.D.Ill.1991). Instead, such a finding means only that plaintiff is potentially liable for contribution under CERCLA. Once plaintiff is found to be a responsible party under § 107(a), the questions shifts to how much is that plaintiff responsible for under the provisions of § 113(f)(1). Id. Section 113(f)(1) does not limit the Court to any specific equitable factors in its determination of how much each party should contribute to the cost of the containment. Instead, § 113(f)(1) provides that "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." Factors which may be considered include the parties' degree of involvement in the generation, transportation, treatment, storage, or disposal of the hazardous substances. United States v. Monsanto Co., 858 F.2d 160, 168 n. 13 (4th Cir.1988). The Court may also consider the relative degree of fault. Id. Other factors that have been gleaned from the legislative history of CERCLA and considered by the courts are
1. the ability of the parties to distinguish their contribution to the discharge, release, or disposal of the hazardous substance,
2. the amount of hazardous substance involved,
3. the degree of the toxicity of the hazardous substance involved,
4. the degree of care exercised by the parties with respect to the hazardous substance concerned,
5. the degree of cooperation by the parties with government officials to prevent any harm to the public health or the environment.
United States v. A & F Materials Co., 578 F.Supp. 1249, 1256 (S.D.Ill.1984).
After weighing the equitable considerations that this Court deems relevant, the Court concludes that plaintiff is not liable for contribution for any of the containment costs. First, plaintiff did the job it was contracted to do in a safe, professional, and workmanlike manner. Defendant contracted with plaintiff under the continuing unit price agreement and Order No. 0610105 to excavate a trench, lay cable and pipe in the trench, backfill and cap the trench with asphalt, and haul away the excavated dirt. Defendant determined the location of the trench, and plaintiff excavated in accordance with the directions of plaintiff. Defendant told plaintiff to arrange for the disposal of the excavated dirt, and plaintiff hauled the dirt to Schwarz property after obtaining the permission of Mr. Schwarz's tenant.
Second, there was no reason for plaintiff to suspect that the dirt underneath East North Street was contaminated by dioxin. Plaintiff was not informed of the dioxin contamination by officials of the City of Eureka until the dioxin-contaminated dirt was excavated and transported to the Schwarz property. There were no signs on East North Street to indicate that the site was a confirmed dioxin site.
Third, plaintiff was responsible for checking with local utilities to ascertain the locations of buried pipes and cables along the excavation route. This responsibility was allocated to plaintiff in the course of dealings with defendant and by the continuing unit price agreements in paragraph 18. Plaintiff fulfilled this responsibility by visiting local utilities before excavation began in order to obtain up-to-date locations of pipes and cables. If plaintiff ruptured a pipe and cable during a dig, plaintiff paid to fix it. The responsibility for ascertaining whether an excavation site was dioxin-contaminated, however, was not allocated *1235 to plaintiff either through the course of dealing between plaintiff and defendant or by the continuing unit price agreements. Instead, as discussed infra, defendant received information from the MDNR on confirmed dioxin sites and could communicate this information to plaintiff on the maps provided by defendant of the excavation sites.
Fourth, defendant drafted and submitted the application for the excavation permit. The application drafted by Mr. Dye, an employee of defendant, failed to indicate that the trench extended from West North Street onto East North Street. If the permit designated East North Street as the site of excavation, it is likely that Mr. Branscum would have informed plaintiff or defendant of the dioxin contamination.[8]
Fifth, defendant was notified periodically by the EPA and the MDNR of confirmed dioxin sites in the St. Louis Metropolitan area. The East North Street site was designated a confirmed dioxin site by the EPA and MDNR in 1984, approximately two years prior to plaintiff's excavation on East North Street. Unlike defendant, plaintiff did not receive lists of confirmed dioxin sites from the EPA or MDNR. Furthermore, defendant was well aware of the dioxin-contamination at Times Beach through communications from the MDNR and the news media. Times Beach is approximately one mile from the North Street site in Eureka. Plaintiff did not do business in the State of Missouri prior to 1984 and would not have been as apprised as defendant of dioxin-contamination in the Eureka area.
Sixth, plaintiff did not exacerbate the problem after it learned of the dioxin contamination. Plaintiff immediately ceased its operations, and cooperated with the EPA in identifying and enclosing the dirt that came from East North Street.
In sum, plaintiff was hired to excavate a trench for defendant and performed the job in a professional and workmanlike manner. Plaintiff was not aware that the dirt was contaminated by dioxin. Plaintiff's failure to detect the dioxin contamination was through no fault of plaintiff. Under these circumstances the Court concludes that plaintiff is not liable for contribution of the containment costs.

Directed Verdicts
At the close of all the evidence the Court sustained a directed verdict in favor of defendant on Count II and Count III of plaintiff's second amended complaint, and in favor of plaintiff on Count I, Count II, and Count III of defendant's second amended counterclaim. The Court sets forth, infra, the reasons for the directed verdicts.

Count II of Plaintiff's Complaint  Breach of Contract
Plaintiff alleges that defendant is liable for a breach of contract in the termination of the continuing unit price agreements. The continuing unit price agreements provided, in paragraph 4:
This agreement may be terminated by either party giving thirty days written notice to the other party. Jobs in progress at the time of termination will be continued under this agreement until completed by the Contractor and accepted by the Telephone Company.
On September 30, 1987 defendant notified plaintiff in writing that it was terminating, as of October 30, 1987, the continuing unit price agreements in effect between the two parties. For purposes of the directed verdict the Court will assume that the motive of defendant in terminating the continuing unit price agreements was retaliation against plaintiff for plaintiff's refusal to pay the containment costs of the dioxin-contaminated dirt.
The source of the defendant's alleged breach is a breach of the duty of good faith and fair dealing. Defendant has an implied duty of good faith and fair dealing in the performance and enforcement of *1236 a contract. Restatement (Second) of Contracts § 205. The implied duty of good faith and fair dealing extends to the cancellation of a contract. Machine Maintenance & Equipment Co. v. Cooper Industries, Inc., 634 F.Supp. 367, 372 (E.D.Mo. 1986) ("Machine Maintenance"); Morton v. Hearst Corp., 779 S.W.2d 268, 273 (Mo. App.1989); Martin v. Prier Brass Mfg. Co., 710 S.W.2d 466, 473 (Mo.App.1986). There is a split of authority on whether the defendant can be liable for breach of contract if it exercised its termination right to deprive plaintiff of expected benefits under the contract despite the fact that defendant canceled in a timely manner. In Grand Light & Supply Co. v. Honeywell, Inc., 771 F.2d 672 (2d Cir.1985) (interpreting Connecticut law) and Friedman & Son, Inc. v. Safeway Stores, Inc., 712 P.2d 1128 (Colo.App.1985), the courts held that a clear termination provision in a contract renders the motive behind the termination irrelevant. However, in Paradee Oil Co. v. Phillips Petroleum Company, 320 A.2d 769 (Del.1974), Gambar Enterprises, Inc. v. Kelly Services, Inc. 69 A.D.2d 297, 418 N.Y.S.2d 818 (1979) (interpreting Michigan law), and Hall v. Farmers Ins. Exchange, 713 P.2d 1027, 1030 (Okla.1985), the courts held that an evil motive behind a timely termination could support claim for a breach of the implied covenant of good faith and fair dealing.
The law of Missouri appears to recognize a cause of action for the bad faith termination of a contract. In Machine Maintenance, Judge Gunn recognized a cause of action for breach of the implied duty of fair dealing for the bad faith termination of a contract that specifically reserved the right of either party to terminate without cause. Judge Gunn stated:
The Court concludes that plaintiff's claim for breach of the duty of fair dealing cannot be based upon a "without cause" termination by defendant, a right specifically reserved by the contract. If in exercising this right, however, defendant acted in bad faith to interfere with plaintiff's rights under the contract, a cause of action for breach of the duty of fair dealing would arise.
Machine Maintenance, supra, 634 F.Supp. at 372 (citing De Treville v. Outboard Marine Corp., 439 F.2d 1099, 1100 (4th Cir. 1971) (interpreting South Carolina law)).
Although the law of Missouri, as interpreted by Judge Gunn, appears to recognize a cause of action for a bad faith termination of a contract, the Court concluded that there was no issue of fact for the jury. Plaintiff alleges that defendant's termination of the continuing unit price agreements, which precluded plaintiff from performing additional jobs on those agreements, constituted a violation of defendant's implied duty of good faith and fair dealing. A claim based on a breach of good faith and fair dealing presupposes that a contractual right existed between the parties. Plaintiff had no contractual right to additional jobs on the continuing unit price agreements that were terminated. The continuing unit price agreements clearly stated that defendant was under no obligation to give plaintiff work or accept plaintiff's bids:
The Telephone Company does not commit itself to order any specific quantity of work under this agreement and may have the same or similar work performed by its own employees or other contractors....
Defendant's refusal to consider plaintiff for additional jobs was not a violation of the implied duty of good faith and fair dealing because plaintiff had no contractual right to be considered for any jobs by defendant under the clear terms of the continuing unit price agreements.
Plaintiff argues that the continuing unit price agreements constituted a commitment by defendant to continue to accept bids from plaintiff. The Court disagrees. The scope of the continuing unit price agreements is limited to the prices and other terms for which plaintiff would work for defendant if defendant offered plaintiff a job in the area covered by the continuing unit price agreement.
Furthermore, plaintiff suffered no damages with regard to the jobs in progress at the time the continuing unit price agreements *1237 were terminated. Plaintiff had jobs in progress on seven of the continuing unit price agreements. Plaintiff was permitted to complete the work on the seven jobs and defendant compensated plaintiff in accordance with the terms of the continuing unit price agreements.

Count III of Plaintiff's Complaint  Promissory Estoppel

A. Promissory Estoppel
Plaintiff alleges that defendant was estopped from refusing to do business with plaintiff by the promises defendant made to induce Mr. Danella to incorporate plaintiff in Missouri.
Section 90 of the Restatement (Second) of Contracts states:
A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.
From Section 90 courts have derived four essential elements of promissory estoppel: (1) a promise, (2) detrimental reliance on the promise, (3) injustice can only be avoided by enforcement of the promise, and (4) the promisor should have or did in fact clearly foresee the precise action which the promisee took in reliance. A.L. Huber & Son, Inc./Clevenger Homes, Inc. v. Jim Robertson Plumbing, Inc., 760 S.W.2d 496, 498 (Mo.App.1988). The first essential element of promissory estoppel is that the defendant has made a binding offer in the form of a promise. Burst v. Adolph Coors Co., 650 F.2d 930, 932 (8th Cir.1981). The promise must be sufficiently definite and delineated to support a claim of detrimental reliance. Bower v. AT & T Technologies, Inc., 852 F.2d 361, 366 (8th Cir.1988).
In the instant matter defendant invited plaintiff to come to Missouri and perform excavation and other construction work for defendant. Defendant informed plaintiff that there was a lot of work in Missouri for a good contractor, and that defendant would provide plaintiff with enough work to keep ten crews busy. After Mr. Danella accepted defendant's invitation to come to Missouri, defendant fulfilled its promise and provided plaintiff with jobs for 3½ years. Defendant made no assurances as to how long defendant would offer plaintiff work. Defendant did not promise that it would provide plaintiff with jobs for a certain number of years. Defendant did not promise that it would provide plaintiff with jobs until plaintiff had the opportunity to recoup its investment.
In essence, plaintiff requests the fact-finder to infer a promise from the circumstances of the matter. Would Mr. Danella accept an invitation to enter Missouri and expend 2½ million dollars in start-up costs unless defendant offered him enough jobs to recoup his investment? Although Mr. Danella's decision appears unwise in hindsight, and such a decision is certainly atypical for such a sophisticated and successful businessman as Mr. Danella, the testimony revealed that Mr. Danella invested 2½ million dollars without assurances from defendant as to the duration of their relationship.
In sum, Mr. Danella set up plaintiff on the promise of being offered work for an unspecified period of time. Plaintiff, therefore, cannot rely on promissory estoppel because defendant made no promises as to the duration of the relationship between plaintiff and defendant.

B. Recoupment of Investment
Mr. Danella spent 2½ million dollars in start-up costs for plaintiff. In order to recoup that investment plaintiff had to do business with defendant for approximately six years. Plaintiff had only done business with defendant for 3½ years when defendant terminated their relationship. Plaintiff alleges that defendant breached an implied duty to do business with plaintiff until plaintiff had an opportunity to recoup its investment.
Missouri law does not yet recognize a general opportunity to recoup an investment. Franchisees and distributors have been afforded an opportunity to recoup their investment. In Ridings v. Thoele, *1238 Inc., 739 S.W.2d 547 (Mo. banc 1987), the court stated:
Missouri common law is clear that the provisions of the contract govern the right, vel non, of a franchisor to terminate a franchise relationship with the important qualification that if the franchisee has in good faith incurred expense and devoted time in building his business he is entitled to a continuance of the relationship for a reasonable time to enable him to recover his investment.
739 S.W.2d at 549 (quoting Bain v. Champlin Petroleum Co., 692 F.2d 43 (8th Cir.1982)). In Cambee's Furniture, Inc. v. Doughboy Recreational, Inc., 825 F.2d 167 (8th Cir.1987) (interpreting South Dakota law), the court stated:
A distributor is entitled to a reasonable period to recoup its investment, during which the agreement may not be terminated without good cause. After the reasonable recoupment period has expired, the distributorship agreement becomes terminable at will upon reasonable notice.
825 F.2d at 173.
Because plaintiff is neither a franchisee nor a distributor, this theory of relief is not available to plaintiff. Furthermore, the Court will not extend to plaintiff the recoupment of investment protection enjoyed by franchisees and distributors. In the franchise and distributorship cases the investment of the plaintiff was lost when franchise/distributor contract was terminated. In the instant matter plaintiff was an excavation and construction company. Although plaintiff's operation was geared toward serving power companies, and plaintiff worked primarily for defendant, the skills of its plaintiff's employees and uses of its machinery enabled plaintiff to do excavation and construction work for other clients beside defendant. In fact, plaintiff had expanded its business in Missouri to serve ConTel and other clients.
In sum, the common law of Missouri does not provide for a general opportunity to recoup its investment. Although franchisees and distributors have been afforded this opportunity, the Court will not step foot onto new ground and provide this right to every businessman, particularly sophisticated ones like Mr. Danella, who do business without the security of a contract of a definite duration.

Count IV of Plaintiff's Complaint  Prima Facie Tort
Plaintiff alleges that defendant's refusal to allow plaintiff to bid on additional work in retaliation for plaintiff's refusal to contribute to the cost of the containment constituted a prima facie tort. The elements of a prima facie tort are
(1) an intentional unlawful act by defendant;
(2) an intent to cause injury to plaintiff;[9]
(3) injury to plaintiff; and
(4) an absence of any justification or an insufficient justification for defendant's act.
Wilt v. Kansas City Area Transit Authority, 629 S.W.2d 669, 672 (Mo.App.1982) (quoting Restatement (Second) of Torts § 870). Missouri courts have consistently limited the application of the prima facie tort.[10]Catron v. Columbia Mutual Insurance Co., 723 S.W.2d 5, 6 (Mo.1987). The courts have expressed a concern that this cause of action would be used in every situation in which an injury or loss occurred and no other tort applied. Id.
In State ex rel. William Ranni Associates, Inc. v. Hartenbach, 742 S.W.2d 134 (Mo. banc 1987) ("Hartenbach"), the beneficiaries of a life insurance policy brought an action against the insurer's general agent because defendant delayed payment on the policy. Plaintiffs asserted that defendant committed a tort in causing a *1239 breach of an insurance contract. In rejecting plaintiffs' argument, the court stated:
To determine the character of an action, whether tort or contract, it is necessary to ascertain the source of the duty claimed to be violated. * * * Here the source of the duty is in contract. The failure to perform a contracted obligation in a timely manner would not be an independent tort in the absence of a contract. This case is not similar to Davidson [v. Hess, 673 S.W.2d 111 (Mo.App.1984) ], where the tenant was wrongfully evicted and the landlord's retention of the tenant's possessions amounts to an act of tortious conversion independent of the contract. Because the duty stems from the contract, the breach does not amount to a tort.
742 S.W.2d at 140. Although the Hartenbach court was not addressing plaintiffs' cause of action for a prima facie tort, the same reasoning applies here.[11] In the instant matter the source of plaintiff's cause of action is in contract. Defendant offered plaintiff work pursuant to the terms of the continuing unit price agreements, which set forth the contractual relationship between the parties. First, under the clear terms of the continuing unit price agreements defendant was not obligated to offer plaintiff any jobs. Second, the continuing unit price agreements provided for termination by either party with thirty days notice. By suing for a prima facie tort plaintiff seeks to obtain additional contractual rights that plaintiff is not entitled to under the terms of the continuing unit price agreements. By granting a directed verdict in favor of defendant, the Court denied plaintiff the attempt to disguise its contract claims in the cloak of a prima facie tort.

Count I of Defendant's Counterclaim  Breach of Contract
Defendant alleges that plaintiff is liable for a breach of the following provisions of the continuing unit price agreement: Paragraph 20: "The Contractor is responsible for the safe performance of all work done under this contract."
Paragraph 7: "The Contractor shall comply with all federal, state, county, and municipal laws, ordinances, and regulations applicable to the performance of the work...."
Paragraph 18: "The Contractor shall take every measure to protect all persons and property ... from injury arising out of the performance of the work."
Defendant alleges that plaintiff, by excavating dioxin-contaminated dirt and transporting it to the Schwarz property, failed to perform the work in a careful and lawful manner as required by Paragraphs 22, 7, and 18 of the continuing unit price agreement. Therefore, plaintiff is liable for the cost of the containment of the dioxin-contaminated dirt.
It is not every breach of a contract that provides a party with a cause of action against plaintiff. Instead, only material breaches of the contract are actionable for damages. Health Related Services, Inc. v. Golden Plains Convalescent Center, Inc., 806 S.W.2d 102, 105 (Mo.App.1991). Defendant's cause of action for breach of contract mistakes the nature of the contract between plaintiff and defendant. Under the continuing unit price agreement and Order No. 0610105 defendant contracted with plaintiff to excavate a trench, lay cable and pipe, backfill and cap the trench with asphalt, and dispose of the excavated dirt. Plaintiff performed these tasks in a timely, professional, careful, and workmanlike manner. The contract does not allocate to plaintiff the responsibility of determining whether the site of the excavation contained dioxin-contaminated dirt. The fact that plaintiff unknowingly excavated and transported dioxin-contaminated dirt is outside the scope of the contract between plaintiff and defendant. Defendant may not sue plaintiff for a breach of the boilerplate provisions of the continuing unit price agreements when plaintiff performed in a professional and workmanlike manner the *1240 tasks that defendant contracted with plaintiff to perform.

Count II of Defendant's Counterclaim  Indemnification
Defendant alleges that plaintiff must indemnify plaintiff for the cost of containing the dioxin-contaminated dirt under paragraphs 24 and 18 of the continuing unit price agreement. Paragraph 24 provides:
INDEMNIFICATION: The Contractor hereby agrees to indemnify and hold harmless the Telephone Company, its agents and employees from all claims, damages or judgments which may arise out of the Contractor's failure to perform the work in a safe and careful manner, notwithstanding the presence of or purported instructions or directions of the telephone company's inspectors, employee or agents or the requirements or provisions of any maps, plans, specifications or other documents applicable to the work furnished by the Telephone Company.
Paragraph 18 provides:
DUTY OF SAFE PERFORMANCE: The Contractor shall take every measure to protect all person and property, including property of the Telephone Company, from injury arising out of the performance of the work. The Contractor shall make such inspections, safety checks, and tests, and shall provide such equipment, personnel, and supervision as is necessary to insure the safe performance of the work. Where a possibility of injury to persons or damage to property is ascertained, the Contractor shall take such remedial action, including the stoppage of work when necessary, as will prevent such injury or damage if such possibility of injury or damage has been caused or claimed to have been caused by the Telephone Company or its employees, the Contractor shall give the Telephone Company prompt notice thereof confirmed in writing and shall not resume work until the Telephone Company gives written permission to do so.
First, the Court must address whether an indemnification clause is enforceable in a CERCLA suit. Section 107(e)(1) of CERCLA provides:
No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.
42 U.S.C. § 9607(e)(1). The first section of this obscure provision appears to prohibit indemnification agreements under all circumstances, while the second section appears to permit indemnification agreements under all circumstances. The Eighth Circuit Court of Appeals has not yet interpreted the meaning of § 107(e)(1). The majority of federal courts that have considered the issue have held that the second sentence of § 107(e)(1) completely negates the first, thereby permitting parties to bargain over indemnification for CERCLA liability under all circumstances. See Versatile Metals, Inc. v. Union Corp., 693 F.Supp. 1563, 1573 (E.D.Pa.1988); Chemical Waste Management, Inc. v. Armstrong World Industries, Inc., 669 F.Supp. 1285, 1293 (E.D.Pa.1987); FMC Corp. v. Northern Pump Co., 668 F.Supp. 1285, 1289 (D.Minn. 1987), appeal dismissed, 871 F.2d 1091 (8th Cir.1988).
The Ninth Circuit and a minority of other courts have taken another approach. Under the Ninth Circuit rule, "all responsible parties will be fully liable to the government regardless of the indemnification contracts they have entered into." Mardan Corp. v. C.G.C. Music, Ltd, supra, 804 F.2d at 1459. At the same time, private parties are free to contract among themselves with respect to indemnification and contribution. Id. In AM International, Inc. v. International Forging Equipment, 743 F.Supp. 525 (N.D.Ohio 1990), the court introduced a third rule: the first sentence of section 107(e)(1) "forbids giving effect to *1241 releases between tortfeasors in CERCLA contribution suits" while the second sentence of § 107(e)(1) "only give[s] effect to contracts binding parties otherwise not liable, to indemnify or insure liable parties." Id. at 530.
Of the three rules, this Court prefers that of the Ninth Circuit. Under the Ninth Circuit rule, the parties are jointly and severally liable with respect to the government in order to insure that the taxpayers are not forced to bear the cost of containing hazardous waste. Private parties, however, are free to contractually distribute the risks of liability among themselves as they see fit. Under the Ninth Circuit rule, this Court must look to the law of the State of Missouri to interpret the effect of the indemnification provisions in the continuing unit price agreement.[12]
Plaintiff argues that the indemnity clauses of the continuing unit price agreement are insufficient to shift liability under CERCLA because they do not clearly state that plaintiff must indemnify defendant for CERCLA liability. Chemical Waste Management, Inc. v. Armstrong World Industries, Inc., supra, 669 F.Supp. at 1294 ("If [parties] wish to redistribute the risks distributed by Congress, they must do so clearly and unequivocally"). Although the Court does not agree that such specificity (i.e., actually mentioning CERCLA in the indemnity provision) is required under Missouri law, there must be some suggestion that the parties intended liability under CERCLA to be within the scope of the indemnity provision. In numerous cases surveyed by the Court the contract between the parties that included the indemnification provision concerned the transportation or handling of known hazardous substances. If the parties know the hazardous nature of the substance, it is fair to assume that the parties were cognizant of possible liability under CERCLA and the parties intended the indemnification clause to shift liability for response costs under CERCLA. In the instant matter neither party was aware that the dirt underneath East North Street was contaminated by dioxin. Because the continuing unit price agreements concerned only the excavation and transportation of regular dirt, the indemnification clause is limited in scope to liability that might arise from the excavation and transportation of regular dirt. In Missouri, indemnity clauses are narrowly construed. United States v. Conservation Chemical Co., 653 F.Supp. 152, 235 (W.D.Mo.1986). A narrow construction of the indemnification provisions in the continuing unit price agreement does not allow for indemnification of containment costs for dioxin-contaminated dirt.
Furthermore, Missouri law provides that an indemnity agreement will not be construed to hold an indemnitee harmless from loss due to the indemnitee's own negligence unless the agreement reflects that it is the intention of the parties, and the intention is expressed in clear, unambiguous, and unequivocal terms. Broad, indefinite or general terms are not sufficient to impose contractual indemnification. Continental Grain Co. v. North Kansas City Electric Co., 658 F.Supp. 767, 769 (W.D.Mo.1987); Bonenberger v. Associated Dry Goods Co., 738 S.W.2d 598, 600 (Mo. App.1987). An example of the specificity required to create such an agreement of indemnification against negligence is found in Missouri Pacific Railroad Co. v. Rental Storage & Transit Company, 524 S.W.2d 898, 908 (Mo.App.1975), where the contract provided for indemnification "notwithstanding any possible negligence."
As was discussed supra, the excavation of the dioxin-contaminated dirt was caused by the negligence, however slight, of defendant. Plaintiff, which was hired to excavate a trench at a site determined by *1242 defendant and carried out that task in a professional and workmanlike manner, was not negligent. The indemnity provisions at paragraph 18 and 24 of the continuing unit price agreements do not in clear, unambiguous, and unequivocal terms make plaintiff liable for the negligence of defendant. Therefore, the indemnification clauses are insufficient to shift the liability for the containment costs.

Count III of Defendant's Counterclaim  Negligence
The market value of the Schwarz property decreased as a result of the dioxin-contaminated soil being placed on the property by plaintiff. In September, 1987 Mr. Schwarz assigned his claim for damages to his property to defendant, which purchased the property of Mr. Schwarz and then deeded it to the City of Eureka. Defendant alleges that plaintiff is liable for damages to Mr. Schwarz's property because of plaintiff's negligence in excavating the dioxin-contaminated dirt and placing it on Mr. Schwarz's property.
Three elements must exist for a case of actionable negligence: (1) a duty owed by plaintiff to protect defendant/Mr. Schwarz from the injury of which defendant complains; (2) failure of the plaintiff to perform that duty, and (3) injury proximately caused by plaintiff's failure. Lavo v. Medlin, 705 S.W.2d 562, 564 (Mo.App.1986); Harris v. Kansas City, 759 S.W.2d 236, 237 (Mo.App.1988). The first element which plaintiff must prove is the existence of a duty on the part of the plaintiff to protect defendant from the injury sustained. Byers v. Spaulding, 725 S.W.2d 893, 895 (Mo.App.1987). "The duty to exercise care may be a duty imposed by common law under the circumstances of a given case." Hoover's Dairy, Inc. v. Mid-America Dairymen Inc./Special Products, Inc., 700 S.W.2d 426, 431 (Mo. banc 1985) (quoting Zuber v. Clarkson Construction Co., 363 Mo. 352, 251 S.W.2d 52, 55 (1952)).
As was discussed supra, plaintiff was not negligent in failing to ascertain that the dirt under East North Street was contaminated with dioxin. First, plaintiff did not have a contractual or common law duty to ascertain whether the dirt it excavated was contaminated with dioxin. The continuing unit price agreement did not allocate to plaintiff the responsibility of checking for dioxin contamination at the excavation site. Furthermore, it was not the custom and practice between plaintiff and defendant for plaintiff to check for dioxin contamination at the excavation site. The continuing unit price agreement and the custom and practice between plaintiff and defendant allocated to plaintiff the responsibility of obtaining up-to-date locations of buried utility cables and pipes. There is no suggestion, however, that this duty extended from hazards buried in the dirt to hazardous substances within the dirt. Second, plaintiff was not informed by defendant, the City of Eureka, the MDNR or the EPA of the presence of a confirmed dioxin site on East North Street.
Plaintiff had a duty to excavate a trench according to the instructions of defendant and dispose of the excavated dirt. Plaintiff fulfilled that duty when it dug where it was instructed to dig, and disposed of the excavated dirt in a place and manner acceptable to defendant. Under these circumstances plaintiff is not liable under a theory of negligence for the depreciation of the value of the Schwarz property.

JUDGMENT
In accordance with the memorandum filed herein this day,
IT IS HEREBY ORDERED that judgment is entered in favor of plaintiff and against defendant on the merits of Count I of plaintiff's second amended complaint. Plaintiff is not liable to defendant under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9613, for contribution of the costs incurred by defendant in containing the dioxin-contaminated dirt.
IT IS FURTHER ORDERED that judgment is entered in favor of plaintiff and against defendant on the merits of Count *1243 IV of defendant's second amended counterclaim.
NOTES
[1] The Center for Disease Control has indicated that dioxin concentration of 1 ppb in surface soil of residential areas poses an unacceptable risk to human health.
[2] Employees of defendant were only present at the North Street site for approximately five hours during the entire project.
[3] In paragraph 18 the continuing unit price agreement allocated to plaintiff the responsibility of locating buried pipes and cables:

[T]he Contractor shall take particular care to avoid coming in contact with or causing damage to any water, sewer, steam, gas, fuel, or pipe lines, mains or service pipes, electrical, communications and other energy transmission, conduits, cables, wires or service connection, other private, utility or governmental facilities and any hazardous condition or thing, whether located upon, below, or above the ground surface, and the Contractor shall take proper measures to determine the presence of noxious, combustibles or explosive gases and to prevent all manner of ignition in and around manholes, excavations, and openings.
[4] Prior to the discovery of dioxin contamination Mr. Goughenour visited the site on a few occasions and inspected the work while in progress.
[5] The Schwarz property was deeded directly from Mr. Schwarz to the City of Eureka.
[6] The exhibits indicate that defendant received a list designating East North Street as a confirmed dioxin site on September 2, 1986, which was after plaintiff excavated the dioxin-contaminated dirt.
[7] Contribution is a statutory or common law right available to those who have paid more than their equitable share of a common liability. See Prosser and Keeton on the Law of Torts § 50 (W. Keeton 5th ed. 1984); Restatement (Second) of Torts § 886A (1979).
[8] The map attached to the permit by defendant shows that the excavation extended from West North Street to East North Street. It is possible that Mr. Branscum granted the permit without reviewing the attached documentation.
[9] Injury is defined in the Restatement (Second) of Torts § 870 as "the invasion of any legally protected interest of another." Porter v. Crawford & Co., 611 S.W.2d 265, 271 (Mo.App.1980).
[10] In Brown v. Missouri P.R. Co., 720 S.W.2d 357, 361 (Mo. banc 1986), cert. den., 481 U.S. 1049, 107 S.Ct. 2180, 95 L.Ed.2d 836 (1987), the Court noted that "no case resulting in a verdict for the plaintiff on a prima facie tort theory has been affirmed by the Missouri appellate courts."
[11] The court later dismissed plaintiffs' cause of action for a prima facie tort because "[the agent] owed no duty to plaintiffs." Hartenbach, supra, 742 S.W.2d at 141.
[12] The Ninth Circuit has held that state law should provide the general content of federal law with respect to interpreting a contract that allegedly releases a party from contract liability under CERCLA. Mardan Corp., supra, 804 F.2d at 1458-1459. In the instant matter the law of Missouri on indemnification would apply because the contract containing the indemnity provisions was executed in Missouri and the work performed under the contract was performed in Missouri. Nika Corp. v. Kansas City, 582 F.Supp. 343, 350 (W.D.Mo.1983) (citing Havenfield Corp. v. H & R Block, Inc., 509 F.2d 1263, 1267 (8th Cir.1975)).