**OLIN CORPORATION, Plaintiff,**

v.

**CONSOLIDATED ALUMINUM CORPORATION and Swiss Aluminum, Ltd., Defendants.**

**No. 87 Civ. 7377 (DNE).**

United States District Court, S.D. New York.

Dec. 1, 1992.

James J. Harrington and Associates, New York City (James J. Harrington, Stephen A. Dvorkin, of counsel), for plaintiff.

Lewis, Rice & Fingersh, St. Louis, MO (John M. Hessel, Joseph E. Martineau, John D. Husmann, of counsel), for defendants.

## OPINION & ORDER

EDELSTEIN, District Judge:

On October 15, 1987, plaintiff Olin Corporation ("Olin") filed this declaratory judgment action. This action is currently before the Court on cross motions for partial summary judgment. Olin seeks partial summary judgment that defendants, Consolidated Aluminum Corporation and its corporate parent, Swiss Aluminum, Limited (collectively "Conalco"), have breached their contractual obligation to indemnify Olin for environmental liability under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* (1989) (as amended). Conalco moves for partial summary judgment that Olin is liable to Conalco for initial investigatory and monitoring costs of an environmental cleanup, pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

## BACKGROUND

From 1955 until December 1973, Olin operated an aluminum fabrication and rolling facility located in Hannibal, Ohio (the "Hannibal Site"). During this period, Olin maintained processing equipment that utilized hydraulic fluid ("Pydraul") manufactured by Monsanto Industrial Chemicals Company ("Monsanto"). This hydraulic fluid contained polychlorinated biphenyls ("PCBs"). PCBs are a hazardous substance as defined by CERCLA. *See* 42 U.S.C. § 9601(14); 33 U.S.C. § 1321(b)(2)(A); 40 C.F.R. § 116.4.

Until 1972, Olin disposed of Pydraul and certain other industrial by-products by depositing them in an impoundment pool located on the Hannibal Site. As the impoundment pool filled, its contents were set afire. That which remained after burning was drained into a swale. During the period in which wastes were disposed of in this manner, Olin was unaware that Pydraul contained PCBs and Olin had no knowledge of the toxicity of PCBs.

Shortly before it discontinued this practice in 1972, Olin received a letter from Monsanto advising it, *inter alia*, that PCBs were present in Pydraul and that prophylactic measures, in the form of high-heat incineration, were necessary to safely dispose of Pydraul. In response, Olin constructed a liquid waste incinerator to dispose of Pydraul and other hazardous liquids. Olin, however, took no action to eliminate contaminants from the pool or from adjacent or subjacent soil.

Late in 1972, Olin decided to divest all assets and liabilities related to the aluminum business. To this end, during 1973 Olin began negotiations with Conalco for the sale of Olin's aluminum operations, including the Hannibal Site. As a result of these negotiations, Olin and Conalco signed a purchase agreement, dated September 21, 1973 (the "Purchase Agreement").

Each of the several agreements executed to effectuate the transaction between Olin and Conalco contains broad language that purports to indemnify Olin for all post-divestment liabilities associated with Olin's ownership of the Hannibal Site and the aluminum operations. None of these agreements, however, specifically addresses allocation of environmental liabilities between Olin and Conalco. Section 4.01(c)(iv) of the Purchase Agreement provides in relevant part:

> Conalco will ... deliver to Olin an instrument or instruments ... whereby Conalco shall assume and agree to be responsible for and to pay, perform, discharge and indemnify Olin against, all liabilities, obligations and indebtedness of Olin ... as they exist on the Closing Date or arise thereafter with respect to actions or failures to act occurring prior to the Closing Date.

When the transaction contemplated in the Purchase Agreement closed on January 1, 1974, Olin and Conalco executed an "Assignment and Assumption Agreement" (the

"Assumption Agreement"). The Assumption Agreement provides in relevant part:

> Conalco hereby assumes and agrees to be responsible for and to pay, perform, discharge and indemnify Olin against all liabilities (absolute or contingent) [related to, *inter alia*, the Hannibal Site] ... as they exist on the effective date or arise thereafter. . . .

Finally, on May 10, 1974, Olin and Conalco entered into an agreement (the "Release") pursuant to which Conalco released and settled claims against Olin in return for $3,700,000. The Release provides in relevant part:

> In consideration of the payment on this date by Olin to Conalco of $3,700,000 ... Conalco hereby releases and settles all claims of any nature which Conalco now has or hereafter could have against Olin ... whether or not previously asserted, under or arising out of the Purchase Agreement ... or the transactions contemplated thereby.

From January 1, 1974 through the present, Conalco has owned and operated the aluminum facility located at the Hannibal Site. In 1986, after inspecting the Hannibal Site, the Ohio Environmental Protection Agency ("Ohio EPA") determined that the pool, as well as the soil adjacent and subjacent to the pool, was contaminated with PCBs. The Ohio EPA ordered remediation of this hazard. Conalco complied with the Ohio EPA order and incurred substantial clean-up costs.[1] Because Conalco believes that Olin's disposal practices created the PCB contamination, Conalco sought voluntary contribution from Olin to cover remediation costs. Olin refused to contribute to the clean-up and filed the instant declaratory judgment action seeking this Court's determination that it is immune from liability under the express terms of the Purchase Agreement, the Assumption Agreement, and the Release (collectively the "Hannibal Sale Documents").

## DISCUSSION

On December 11, 1980, Congress enacted CERCLA to establish and fund enforcement mechanisms for the clean-up of property contaminated by environmentally hazardous chemicals and industrial waste.[2] CERCLA is a broad remedial measure that seeks to protect the public health by requiring prompt remediation of improperly managed hazardous waste sites and by encouraging voluntary remediation of such sites. Essentially a strict liability statute, CERCLA casts a broad liability net. A person[3] may be held fully liable for clean-up costs under Section 107 of CERCLA even if that person neither caused nor contributed to the release of hazardous waste at the site. Section 107 of CERCLA imposes strict liability for the clean-up of hazardous waste on four categories of potentially responsible parties ("PRPs"): The current owner or operator of a hazardous waste site; the owner or operator at the time the waste was deposited at the site; generators of waste sent to the site; and persons that transported waste to the site.

The instant litigation focuses on Section 107(e)(1) of CERCLA, which specifically deals with contractual allocation of CERCLA liability. The House Report analyzing CERCLA explains that the purpose of Sec-

---

**1.** Olin makes the conclusory assertion that Conalco's clean-up of the Hannibal Site was not undertaken under the aegis of CERCLA. *See Reply Memorandum In Further Support Of Olin Corporation's Motion For Partial Summary Judgment* at 3–6. This argument is without merit. It is clear, and this Court finds, that Conalco's clean-up was in fact required by CERCLA. *See Reply Memorandum Of Consolidated Aluminum Corporation In Support Of Its Motion For Partial Summary Judgment And In Opposition to Olin Corporation's Motion For Partial Summary Judgment* at 8–12.

**2.** In 1981, the year after CERCLA was enacted into law, forty-three million metric tons of haz-

ardous waste was produced. *See Developments in the Law—Toxic Waste Litigation,* 99 Harv. L.Rev. 1458, 1462 (1986). The majority of this waste was not incinerated or otherwise rendered non-toxic, but rather was "stored—sealed by commercial waste facilities in 55–gallon drums and deposited in clay-lined dumps, injected deep underground ..., or abandoned in vacant lots, lagoons, or landfills." *Id.*

**3.** CERCLA defines a "person" as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, ... or any interstate body." 42 U.S.C. § 9601(21).

tion 107 of the Act is "to provide a mechanism for prompt recovery of monies expended for the costs of [remedial actions] ... from persons responsible therefore and to induce such potentially liable persons to pursue appropriate environmental response actions voluntarily." H.R.Rep. No. 1016, 96th Cong., 2d Sess., pt. 1, at 33 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6136. Section 107(e)(1) provides:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1).

Emphasizing the first sentence of Section 107(e)(1), Conalco contends that CERCLA prohibits PRPs from contractually relieving themselves of liability. *See Memorandum of Consolidated Aluminum Corporation In Support of Its Motion For Partial Summary Judgment,* ("Conalco's Memorandum In Support") at 15. Conalco recognizes, however, that a majority of courts have interpreted this Section as allowing private parties who are themselves PRPs to contractually transfer CERCLA liability. *See id.* Conalco thus argues in the alternative that, while parties may contractually allocate CERCLA liability, to be effective, such agreements must include a clear, express and unequivocal waiver of CERCLA rights. *See id.* at 16. Conalco contends that the indemnification agreements to which it is a party do not meet this threshold requirement.

Olin, on the other hand, contends that Conalco may not seek contribution for response costs related to any wastes on the Hannibal Site because Conalco agreed to indemnify Olin for environmental liability. *Memorandum In Support of Olin Corporation's Motion For Partial Summary Judgment, and In Opposition to Consolidated Aluminum Corporation's Motion For Partial Summary Judgment,* ("Mem-orandum In Support of Olin's Motion") at 23. Citing *Purolator Products Corp. v. Allied–Signal, Inc.,* 772 F.Supp. 124, 130 (W.D.N.Y.1991), Olin argues that a majority of courts interpret Section 107 to allow private parties to enter into valid and enforceable agreements to allocate CERCLA liability. Olin urges this Court to adopt the *Purolator* court's reasoning that

> CERCLA does not prohibit private parties from entering into indemnity agreements. Such agreements do not absolve the parties of liability to the Government. They may, however, form the basis of an action to obtain indemnification, and they may also be asserted as a defense in an action between the parties to the agreement.... Thus, if a party that is the beneficiary of an indemnity agreement is sued by a CERCLA claimant, that party may seek indemnification from the other party to the agreement.

*Purolator Products,* 772 F.Supp. at 130.

**1. *CERCLA Does Not Render Unenforceable Indemnity Agreements Between Private Parties***

■ Before addressing whether the indemnity agreements in the instant dispute cover CERCLA liability, it is necessary to determine whether any such agreements may properly affect CERCLA liability, regardless of whether or not the parties intended such coverage. Courts offer varied interpretations of Section 107(e)(1) and its impact on the validity and enforceability of indemnification agreements which purport to allocate CERCLA liability among PRPs. This inartfully drafted provision has produced three conflicting interpretations.

The first, and perhaps least satisfying interpretation of Section 107(e)(1), is to treat the second sentence of the Section as completely negating the first sentence, thereby permitting parties unfettered discretion to bargain over CERCLA liability. *See, e.g., Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563, 1573 (E.D.Pa. 1988); *Chemical Waste Management v. Armstrong World Indus., Inc.,* 669 F.Supp. 1285, 1289 (E.D.Pa.1987). This interpretation is fatally flawed. Giving force to indemnification agreements in certain

situations runs directly contrary to the congressional purpose underlying CERCLA. A primary aim of CERCLA is "to provide a mechanism for prompt recovery of monies expended for the costs of [remedial actions] ... from persons responsible therefore," rather than forcing taxpayers to bear the cost of environmental clean-up. H.R.Rep. No. 96–1016, 96th Cong., 2d Sess., pt. 1, at 33 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6136. Allowing an indemnification or hold-harmless agreement to prevent government recovery of remediation expenditures contravenes this goal. Moreover, none of the courts that have advocated this approach have cited the legislative history of CERCLA to support the view that the second sentence of Section 107(e)(1) renders the first sentence nugatory. While the weakness inherent in such an approach should be self-evident, a less obvious though critical problem with this reasoning is that it fails to account for, and ignores, the first sentence of Section 107(e)(1). With scant discussion, these courts appear to predicate their holdings on the public policy ground that, because CERCLA liability is broad, parties should be afforded the discretion to allocate risk. This Court can find no basis for such a result in the text, legislative history or policy goals of CERCLA.

A second interpretation of Section 107(e)(1) is found in *AM International, Inc. v. International Forging Equipment,* 743 F.Supp. 525 (N.D.Ohio 1990). Under the *AM International* approach, indemnification clauses between PRPs are *per se* invalid with regard to CERCLA liability, but indemnification clauses that allocate liability to persons not already liable under the Act, such as insurance companies and other non-PRPs, are valid. Therefore, under this interpretation, liability may be contractually expanded, but may not be reduced or simply shifted. While this approach finds some support in a single colloquy that occurred in the Senate, *see* 126 Cong.Rec. 30,984 (1980), it runs counter to the generally recognized public policy favoring freedom of contract. Moreover, a *per se* prohibition on apportionment of liability between potentially responsible parties, especially when enforced retroactively,

is both economically inefficient and fundamentally unfair. Liability, like other issues negotiated in the context of a mutually beneficial business transaction, has an economic value to the parties to the transaction—one that is, and should be, the subject of vigorous bargaining. Absent a statutory directive, it would be poor public policy for the Court to prohibit or skew the results of such bargaining.

A final approach, and one this Court finds persuasive, was enunciated by the Ninth Circuit in *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1458–59 (9th Cir.1986). In *Mardan,* the court held that under Section 107(e)(1) private parties may contract with respect to indemnification and contribution but that all "responsible parties will be fully liable to the government regardless of the indemnification contracts they have entered into." *Id.* Thus, "parties may not contract out of liability vis-a-vis the government, but may contract out of liability vis-a-vis other private parties." *Jones–Hamilton Co. v. Kop–Coat, Inc.,* 750 F.Supp. 1022, 1026–27 (N.D.Cal. 1990), *aff'd in part and rev'd in part on other grounds,* 973 F.2d 688 (9th Cir.1992). Liability to the government under this view is joint, several and unaffected by indemnity agreements. Concurrently, however, parties are permitted to allocate environmental liability among themselves as they see fit.

■ The *Mardan* approach is appealing for several reasons. Under this rule, PRPs remain jointly and severally liable to the government, which ensures that taxpayers are not burdened with the cost of environmental clean-up. Such a result comports with an important goal of CERCLA—to place the cost of remediation on responsible parties rather than on the public as a whole. Moreover, this interpretation makes sense of the first sentence of Section 107(e)(1), which states that "[n]o indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other

person the liability imposed under this section." The principle rule of construction of any statute is that the Court must begin with the language of the statute itself. *See United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). The first sentence of Section 107 clearly assumes the joint and several liability of all liable parties to any party that, under the Act, has the right to demand clean-up and redress of damages, *i.e.,* the government. It is this joint and several liability to which Congress is referring when it speaks of "the liability imposed under this section" in the last words of the first sentence of this Section.

Concurrently, however, private parties are allowed to negotiate over, and may allocate among themselves, CERCLA liability. This result follows from the second sentence of Section 107(e)(1), which states that "[n]othing in this subsection shall bar any agreement to ... indemnify a party to such agreement for any liability under this section." Allowing private parties to distribute contractually the risks of liability is favored on public policy grounds and is economically efficient. A company purchasing the assets of another, for example, should be allowed either to accept or reject the risk of assuming liability from the seller, and its choice should be reflected in the sale price. Indeed, what scant legislative history exists concerning this issue supports the proposition that, under CERCLA, parties remain liable to the government irrespective of contractual agreements, but may enter into private indemnity agreements that allocate cost among the parties. *See Purolator,* 772 F.Supp. at 129 (*citing* H.R.Rep. No. 96–1016, pt. 1, 96th Cong., 2d Sess. 1, 17 (1980)).

There is a clear trend among the courts that have considered this issue to adopt the *Mardan* approach. *See, e.g., Purolator,* 772 F.Supp. at 129–30; *Niecko v. Emro Mktg. Co.,* 769 F.Supp. 973, 988–89 (E.D.Mich.1991), *aff'd,* 973 F.2d 1296 (6th Cir.1992); *Danella Southwest, Inc. v. Southwestern Bell Tel. Co.,* 775 F.Supp. 1227, 1241 (E.D.Mo.1991), *aff'd,* 978 F.2d 1263 (8th Cir.1992); *Armotek Indus., Inc. v. Seymour Freedman,* 790 F.Supp. 383, 386–87 (D.Conn.1992); *Southland Corp. v. Ashland Oil, Inc.,* 696 F.Supp. 994, 1000 (D.N.J.1988). The *Mardan* approach is sound. CERCLA Section 107(e)(1) allows indemnity agreements between private parties. Such agreements, however, in no way restrict the government's right to reimbursement pursuant to CERCLA for expenditures necessary to remediate environmental hazards. PRPs remain jointly and severally liable for any government-incurred clean-up costs. This Court adopts the *Mardan* approach with regard to the validity of indemnification clauses.

### 2. Interpretation of the Indemnification Provisions

Once it is determined that indemnification clauses, in general, are enforceable between private parties in a CERCLA suit, the specific clauses at issue in the case must be interpreted in order to determine whether *these* clauses do in fact address and allocate CERCLA liability. A threshold determination is whether state or federal common law[4] governs interpretation of the contractual provision that purports to indemnify against, or release, CERCLA liability.

#### a. State Law Is Incorporated to Govern the Interpretation of Contractual Agreements Allocating CERCLA Liability

It is well established that federal law governs the validity of purported releases of liability in connection with federal causes of action. *See Dice v. Akron, Canton & Youngstown R.R. Co.,* 342 U.S. 359, 361, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952);

---

**4.** Several commentators have noted that the very term "federal common law" is not analytically precise. The demarcation between "statutory interpretation" or "constitutional interpretation," on the one hand, and judge-made law on the other, is not a sharp line.... [T]he term, federal common law, [is used] to refer generally to federal rules of decision whose content cannot be traced ... to federal statutory or constitutional command.

Bator, Mishkin, Meltzer & Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 863 (1988).

*Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.,* 558 F.2d 1113, 1115 (2d Cir. 1977). The fact that federal law governs, however, does not mean that district courts must fashion a uniform national rule. Rather, the Court must determine whether, although federal law governs, state law should be incorporated to provide the content of that federal law. *See Burks v. Lasker,* 441 U.S. 471, 477, 99 S.Ct. 1831, 1836–37, 60 L.Ed.2d 404 (1979); *United States v. Kimbell Foods,* 440 U.S. 715, 727–28, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979). State rules of decision frequently provide an adept way to give content to, and apply, the governing federal law. *See Kimbell Foods,* 440 U.S. at 728, 99 S.Ct. at 1458.

■ The first guide in determining whether to incorporate state law or fashion a uniform federal standard is congressional intent. However, neither the text of the statute nor the legislative history of 107(e)(1) sheds light on whether CERCLA's drafters intended federal courts to develop federal common law or incorporate state law in this area.[5] In the absence of a clear congressional directive, the Court must decide whether formulating a uniform federal rule is appropriate under the three-part test enunciated by the Supreme Court in *Kimbell Foods. Kimbell Foods* directs the Court to assess whether: (1) the issue requires "a nationally uniform body of law;" (2) "application of state law would frustrate specific objectives of the federal programs"; and (3) "application of a federal rule would disrupt commercial relationships predicated on state law." *Kimbell Foods,* 440 U.S. at 728–29, 99 S.Ct. at 1459.

In this case, it is unnecessary to craft uniform federal common law. Under the first *Kimbell Foods* factor, there is no reason to think that a uniform body of law is required. Commercial enterprises purchasing or selling assets generally look to state law when drafting contracts. CERC-

LA is but one of several potential sources of liability that may be the subject of indemnification; thus, it is efficient if state law controls contractual interpretation in this area. State contract law is sufficiently well-developed and even-handed in application to permit interpretation of indemnification agreements within the context of private parties' CERCLA liability.

Moreover, under the second *Kimbell Foods* factor, the application of state law will not frustrate a specific objective of CERCLA. Because liability to the government remains joint and several under Section 107(e)(1), indemnification as between private parties has no impact on the central goal of CERCLA—to hold PRPs, rather than taxpayers, liable for the cost of environmental clean-up. Indeed, which of two private enterprises ultimately pays clean-up costs is largely irrelevant in terms of CERCLA's ultimate goal of remediation of hazardous waste sites.

Finally, under the third *Kimbell Foods* factor, fashioning a national interpretive standard might interfere with reasonable commercial expectations. It is true that commercial entities today engaged in the sale of assets are aware of the potential of CERCLA liability, and in light of the principle that federal law governs the validity of releases of federal causes of action, *see Dice,* 342 U.S. at 361, 72 S.Ct. at 314, could reasonably expect to be governed by a national standard. The converse, however, is true of parties, such as those now before the Court, that entered into indemnity agreements prior to the enactment of CERCLA. Such parties reasonably would have expected their agreements to be governed by, and interpreted in accordance with, state contract law. While this factor is not dispositive, the fact that so many similarly situated parties are affected by CERCLA weighs heavily in favor of the incorporation of state law.

---

5. The sole interpretive guide in the legislative history is a statement by Representative Florio to the effect that CERCLA would "insure the development of a uniform rule of law, ... discourage businesses dealing in hazardous substances from locating primarily in states with more lenient laws, [and] the bill will encourage the further development of a Federal common law." 126 Cong.Rec. H11787 (daily ed. Dec. 3, 1980). This statement is not dispositive, however, because the legislative history is otherwise barren of similar statements and there is no evidence that Representative Florio's interpretation reflected congressional intent.

Under the *Kimbell Foods* test, therefore, state law should serve as the federal rule of decision in the instant case and thus control whether a given indemnification agreement affects or allocates CERCLA liability. As a matter of statutory interpretation and judicial policy, this Court views the incorporation of state law as the favored course. It is not disputed that, if state law is employed as the rule of decision in the instant matter, the law of New York State provides the appropriate basis for this Court's decision.[6]

b. Under New York Law, the Indemnity Agreements Entered Into By Olin and Conalco Are Valid and Enforceable

■■■ Under New York law, agreements purporting to exculpate and indemnify parties for the results of their own actions are strictly construed. "[C]ontracts indemnifying a party against his own negligence are generally disfavored." *Quintel Corp., N.V. v. Citibank, N.A.,* 596 F.Supp. 797, 801 (S.D.N.Y.1984) (construing New York law). Such agreements will be closely scrutinized by the courts. *Niagara Frontier Transp. Auth. v. Tri–Delta Constr. Corp.,* 107 A.D.2d 450, 487 N.Y.S.2d 428, 430 (4th Dep't), *aff'd,* 65 N.Y.2d 1038, 494 N.Y.S.2d 695, 484 N.E.2d 1047 (1985). For an indemnity clause to insulate a party from liability for its own negligence, "such intention [must be] expressed in unequivocal terms." *Id.* However, "[c]ontractual provisions which express a clear and unmistakable intent to indemnify a party against his own negligence are enforceable in New York." *Simon v. Corbetta Constr. Co.,* 391 F.Supp.

708, 709 (S.D.N.Y.1975); *see Quintel Corp.,* 596 F.Supp. at 801; *Dillon v. Riverso Constr. Co.,* 39 A.D.2d 744, 332 N.Y.S.2d 432, 433–34 (2d Dep't 1972), *aff'd,* 33 N.Y.2d 530, 347 N.Y.S.2d 434, 301 N.E.2d 422 (1973).

■■■ Although CERCLA is a strict liability statute, rather than one based on negligence, similar policy concerns underlie New York's treatment of agreements indemnifying against one's own negligence and indemnification agreements applicable to CERCLA. *See Purolator Products,* 772 F.Supp. at 131 ("While CERCLA liability is strict, and is not based on negligence, I believe that the policy behind the [New York] rule regarding negligence is also applicable [to CERCLA].") CERCLA is intended to hold potentially responsible parties liability for clean-up costs[7]—a concept that necessarily implicates fault. CERCLA provides an incentive for PRPs to voluntarily remediate hazards, but, prospectively it also provides a deterrent to the unsafe release of hazardous materials. Similarly, New York tort law attempts to make injured persons whole while providing a disincentive for dangerous behavior. On the basis of the analogous policy concerns at issue, this Court finds that a New York court would apply the interpretive rules regarding indemnification clauses in negligence actions to similar agreements purporting to allocate liability under CERCLA.

3. *Summary Judgment*

A party seeking summary judgment must demonstrate "that there is no genuine issue as to any material fact" such that

---

6. The Purchase Agreement ¶ 7.05 provides, in relevant part, "[t]his Agreement shall be construed and governed by the laws of the State of New York." Likewise, the parties are in agreement on this issue. *See Conalco's Memorandum In Support* at 24 ("If the Court should decline to adopt a uniform federal common law, the Court should apply New York law to the issues."); *Memorandum In Support of Olin's Motion* at 33 n. 17 ("[I]t was clearly the expectation of the parties that New York State law would be applied.").

7. CERCLA is designed to ensure " 'that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsi-

bility for remedying the harmful conditions they created.'" *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir.1986) (quoting *United States v. Reilly Tar & Chem. Corp.,* 546 F.Supp. 1100, 1112 (D.Minn. 1982)). CERCLA "imposes the costs of cleanup on those responsible for the contamination." *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 7, 109 S.Ct. 2273, 2277, 105 L.Ed.2d 1 (1989). As Representative Florio, the House sponsor of the Act, stated in connection with CERCLA's passage, "a strong liability scheme will insure that those responsible for releases of hazardous substances will be held strictly liable for costs of response and damages to natural resources." 126 Cong. Rec. 31,964 (1980).

it "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). "It is well settled that a court should grant a motion for summary judgment only if the evidence, viewed in the light most favorable to the party opposing the motion, presents no genuine issue of material fact." *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir.1990); *see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 408 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991).

■ "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight*, 804 F.2d at 11 (citations omitted). However, mere conclusory allegations, or a dispute between the parties as to contractual interpretation, will not defeat a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir.1989). Summary judgment is an appropriate tool by which to resolve disputes concerning legally operative contractual provisions. As the Supreme Court has recognized, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 1).

■ When the terms of an agreement are clear and unambiguous, a court will not look beyond the "four corners" of the document to determine what the parties meant. *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 581 F.Supp. 241, 243 (S.D.N.Y.1984), *aff'd*, 757 F.2d 523 (2d Cir.1985). Provided that the language of an agreement is un-

ambiguous and reasonable people could not differ on its meaning, a court may decide the proper interpretation of the language in the agreement. *American Home Assurance Co. v. Baltimore Gas & Elec.*, 845 F.2d 48, 51 (2d Cir.1988). Conversely, "[i]f an ambiguity in the contract exists, then summary judgment is generally improper, because the principles governing summary judgment 'require that where contract language is susceptible of at least two fairly reasonable meanings, the parties have a right to present extrinsic evidence of their intent at the time of contracting.' " *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1097 (2d Cir.1992) (quoting *Schering Co. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983)).

■ In the instant case no ambiguity exists as to the proper interpretation of the indemnity clauses contained in the Hannibal Sale Documents. Contractual provisions that express a clear and unmistakable intent to indemnify a party against the consequences of his or her own actions are enforceable under New York law. *Simon*, 391 F.Supp. at 709; *Quintel Corp.*, 596 F.Supp. at 801. By its express terms, the Release provides that Conalco "releases and settles *all claims of any nature* which Conalco now has *or hereafter could have* against Olin ... whether or not previously asserted, under or arising out of the Purchase Agreement ... or the transactions contemplated thereby." (emphasis added). One would be hard pressed to draft broader or more inclusive indemnification provisions than those entered into by Conalco and Olin. Indeed, similar provisions have repeatedly been enforced by New York courts. *See, e.g., Margolin v. New York Life Insur. Co.*, 32 N.Y.2d 149, 344 N.Y.S.2d 336, 339, 297 N.E.2d 80, 82–83 (1973); *Levine v. Shell Oil Co.*, 28 N.Y.2d 205, 321 N.Y.S.2d 81, 85–87, 269 N.E.2d 799, 801–03 (1971); *Kurek v. Port Chester Hous. Auth.*, 18 N.Y.2d 450, 276 N.Y.S.2d 612, 615–16, 223 N.E.2d 25, 27–28 (1966); *Merchants Mutual Insur. Co. v. Saxon Indus. Inc.*, 170 A.D.2d 654, 566 N.Y.S.2d 933, 935 (2d Dep't 1991). This Court finds that the indemnity provisions contained in the Hannibal Sale Documents are suffi-

ciently broad to indemnify Olin against liability to Conalco pursuant to CERCLA.[8]

There are no factual issues to be tried. The indemnification agreements incorporated into the Hannibal Sale Documents are clear on their face. These provisions effectively shield Olin from liability to Conalco and, thus, partial summary judgment in favor of Olin is appropriate.

### CONCLUSION

For the reasons stated above, Olin Corporation's motion for partial summary judgment is hereby GRANTED. Consolidated Aluminum Corporation's and Swiss Aluminum, Ltd.'s motion for partial summary judgment is DENIED.

SO ORDERED.

8. Although this Court has interpreted the relevant contractual provisions in accordance with New York law, it should be noted that this Court would reach the same result under federal common law. New York contract law is well-developed and even-handed in application. The policy basis of New York contract law parallels that which this Court would rely on in crafting a federal common law to govern the interpretation of indemnity agreements for the purpose of CERCLA.