Francis R. FOLINO and
Virginia R. Folino

v.

HAMPDEN COLOR AND CHEMICAL COMPANY

v.

FOLINO INDUSTRIES, INC.

Civ. A. No. 91–186.

United States District Court,
D. Vermont.

Sept. 2, 1993.

---

Craig Weatherly, Gravel and Shea, Burlington, VT, for plaintiffs, counter-defendants and third party plaintiff Folino Industries, Inc.

Peter W. Hall, Abell, Kenlan, Schwiebert & Hall, Rutland, VT, for defendant, counter claimant, and third party plaintiff Hampden Color and Chemical Co., Inc.

---

### OPINION and ORDER

BILLINGS, District Judge.

A portion of this matter was tried before a jury in March 1993. Now, the Court must address these remaining issues: 1) defendant's counterclaim and third-party complaint for environmental response costs under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601, *et seq.*, as amended ("CERCLA"); 2) defendant's claims under the Vermont Waste Management Act, 10 V.S.A. § 6615 ("VWMA"); and 3) plaintiffs' claim for attorney's fees pursuant to a lease agreement between the parties.

For the reasons stated below, we hereby DISMISS defendant's counterclaims and third-party complaint and award plaintiffs $120,876.33 in attorney's fees.

### Findings of Fact

During late 1980 or early 1981, Folino Industries opened a chemical distribution business at 11 Morse Drive in Essex Junction, Vermont. As part of the business, certain hazardous chemicals were transferred from bulk tankers to drums, which were then distributed to Folino customers. Customers would return empty barrels. Hazardous chemicals present on the site included 1–1–1 trichloroethene, 1–1–1 trichloroethane, and PERC.

In May 1981, Virginia and Francis Folino ("Folinos") began negotiating a possible sale of the site with Andrew Woolworth, then the president of Hampden Color and Chemical Co. ("Hampden"). During the negotiations, Hampden hired Aquatec Inc. to test for chemical contamination on the site. Although Aquatec found contamination, Hampden did not disclose this to the Folinos and in September 1981 Hampden leased the site.[1] As part of the arrangement, Folino Industries subleased a portion of the building, known as "Bay # 1," for the purpose of cleaning and selling drums used to store chlorine.

During its tenancy, Hampden continued to use the site for a chemical redistribution business. Some of the same hazardous chemicals used by the Folinos, including TCE and 1–1–1 trichloroethane, were on the site during Hampden's tenure. Furthermore, evidence at trial showed that contamination of the site continued during Hampden's tenancy. For example, one witness testified that he observed chemical storage drums lying on their sides and chemicals dripping from siphon pumps used to transfer chemicals from larger to smaller containers.

Folino Industries also used the site. Evidence showed that through some time in 1983 or 1984, Folino Industries used Bay # 1 to clean chlorine storage drums. Afterwards, Folino Industries continued to store chemicals there. Evidence was that some of the chemicals used in cleaning the storage drums in Bay # 1 could have been washed down the drain leading outside.

In 1987, Andrew Woolworth sold Hampden Color and Chemical Co. In connection with the sale, he disclosed the 1981 Aquatec report to Mr. Folino and to Hampden's current president Philip Bendheim. When Mr. Folino learned of the report, he disclosed the information to the State of Vermont.

After the disclosure, both parties incurred response costs. The Folinos hired Wehran

---

1. The lease was for a term of one year. The tenant had the option to extend the term for an additional period of nine years. At trial, the jury determined that Hampden had extended the lease for the additional nine years. *See* Jury's Special Interrogatories # 4.

Engineering to study the site [2] and conducted other remedial measures. Later, in response to a January 1990 order from Vermont's Agency of Natural Resources (ANR), Hampden Color and Chemical hired GEI Consultants to investigate the site.

In this action, each party sought response costs from the other. The Folinos sought to recover pursuant to the lease agreement and VWMA and CERCLA. Hampden counterclaimed pursuant to the lease agreement and the statutes and brought a third-party action against Folino Industries.

The lease claims, with the exception of attorney's fees, were tried before a jury.[3] Now we turn to the remaining issues.

### Discussion

**I. *Hampden's claims under CERCLA and VWMA***

To render judgment on Hampden's claims for response costs pursuant to CERCLA and VWMA, the Court must address the following issues: 1) whether the lease agreement between the Folinos and Hampden was intended to allocate responsibility for environmental response costs; 2) whether the jury's conclusion that the Folinos did not cause Hampden to incur response costs precludes the Court from awarding Hampden such costs under the statutes; 3) whether Hampden may present additional evidence on its statutory claims; and 4) whether Hampden is entitled to recover under 42 U.S.C. § 9607(a) and 42 U.S.C. § 9613(f).

#### A. *Whether the lease agreement "preempts" CERCLA and VWMA*

In this case, we must decide whether the Folinos and Hampden privately allocated responsibility for environmental response costs by means of their lease agreement.

The Folinos argue that specific paragraphs in the lease agreement effectively allocated environmental response costs and therefore preclude Hampden from recovering these costs pursuant to the state and federal statutes. Hampden responds that the lease agreement does not contain language sufficient to displace the statutory schemes.

It is clear that CERCLA § 107(e) (1) [4] enables private parties to allocate potential CERCLA liability. *See Commander Oil Corporation v. Advance Food Service Equipment,* 991 F.2d 49, 51 (2nd Cir.1993) ("Under CERCLA § 107(e)(1), the right of private parties to enter into indemnification agreements is preserved."); *see also Olin Corp. v. Consolidated Aluminum Corp.,* 807 F.Supp. 1133, 1137–39 (S.D.N.Y.1992). Furthermore, it appears that in the Second Circuit, we look to state contract law, rather than federal common law, to determine whether the contracting parties intended to allocate responsibility for environmental cleanup. *See Commander Oil,* 991 F.2d at 51 (applying New York law, without discussion); *see also Olin Corp.,* 807 F.Supp. at 1140–1141 (holding state law governs contracts entered into *prior* to enactment of CERCLA and generally discussing the issue); *International Clinical Laboratories, Inc. v. Stevens,* 710 F.Supp. 466, 469–70 (E.D.N.Y.1989) (applying New York law); *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1457–60 (9th Cir.1986) (holding that state law governs).

Vermont permits indemnity agreements between landlords and tenants. *See Lamoille Grain Co. v. St. Johnsbury and Lamoille County R.R.,* 135 Vt. 5, 7–8, 369 A.2d 1389 (1976). Furthermore, "[w]here the language of the agreement is clear, the intention and understanding of the parties

---

**2.** Mr. Folino initially hired Aquatec, but terminated that relationship.

**3.** After a trial of the claims made pursuant to the lease, the jury awarded the Folinos $135,000 in cleanup costs; $33,000 in lost rent; and $23,100 for property damage to the leased premises in excess of normal wear and tear.

**4.** 42 U.S.C. § 9607(e) reads as follows:
(1) No indemnification, hold harmless, or similar agreement or conveyance shall be effective

to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

must be taken to be that which their agreement declares." *Id.* at 8, 369 A.2d 1389.

Here, the plain language of the lease indicates that the parties intended that each bear responsibility for their own failure to comply with applicable laws. Pursuant to paragraph 12 of the lease, the landlord warranted that the premises were "in full compliance with all laws, rules and regulations of federal, state and local authorities...." Furthermore, the landlord "at its sole cost and expense will correct or eliminate any condition found to be a violation by any such federal, state or local authority resulting from the Landlord's non-compliance prior to or at the time the Premises were delivered...." Conversely, the tenant was obliged to comply with "all requirements or orders of state, municipal or public authority affecting the Premises subsequent to the commencement of this Lease...."

This provision of the lease required the Folinos to indemnify Hampden for any costs Hampden incurred as a result of the Folinos' failure to deliver the premises in compliance with federal and state laws. The Court finds no reason to conclude that the general language of paragraph 12 was not intended to encompass CERCLA liability.

Similarly, paragraph 18 of the lease agreement provides that the landlord indemnify the tenant for liability "arising from the Landlord's activities on the Premises prior to delivery of the Premises to the Tenant or from any condition existing on the Premises at the time of such delivery." Under this paragraph, the Folinos agreed to indemnify Hampden for any liability resulting from their activities on the premises prior to delivery. Paragraph 19 provides the converse. Again, we see no reason to conclude that these lease provisions were not intended to cover claims for environmental response costs incurred as a consequence of environmental contamination of the site.

Consequently, we conclude that the parties effectively allocated responsibility for environmental response costs in the lease agreement and that the jury considered the allocation of these costs at trial. Nevertheless, we go on to consider Hampden's statutory claims. In so doing we note first, that the lease does not govern Hampden's third-party complaint against Folino Industries and second, that VWMA does not include a provision comparable to 42 U.S.C. § 9607(e).

### B. *Impact of the jury's findings on the statutory claims*

■ Plaintiffs argue that the jury's finding that Hampden did not incur costs due to contamination introduced to the site by the Folinos precludes the Court from awarding Hampden response costs under the federal and state statutes. Hampden, on the other hand, argues that the jury's finding is not binding because "causation" is not an element of prima facie liability under CERCLA or VWMA.

We agree with Hampden for the following reasons. Under the lease, the jury had to find that contamination placed on the site by the Folinos prior to 1981 "proximately caused" Hampden to incur response costs. No such causation requirement is contained in CERCLA § 9607(a). *See New York v. Shore Realty Corp.,* 759 F.2d 1032, 1044–45 (2d Cir.1985); *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 264–266, *reh'g, en banc, denied,* 1992 U.S.App. LEXIS 17371 (3d Cir.1992) (holding no "proximate cause" requirement in CERCLA). The Vermont statute, 10 V.S.A. § 6615(a), parallels CERCLA in this regard.

Furthermore, as Hampden points out, the jury did not even address the issue of whether Hampden incurred response costs as a consequence of contamination placed on the site by Folino Industries between 1981 and 1984.

Consequently, the Court finds that the jury's conclusion that the Folinos did not "proximately cause" Hampden to incur response costs is not determinative of Hampden's statutory claims.

### C. *Whether Hampden may introduce additional evidence*

Prior to addressing Hampden's claims, the Court must resolve a preliminary matter—whether Hampden may introduce additional evidence, beyond that which was presented at trial, to support its statutory claims. The

Folinos maintain that before trial, the parties agreed that all evidence was to be presented at trial; Hampden maintains that it understood that additional evidence unique to the statutory claims would be admitted after the trial on the lease agreement.

During a chambers conference prior to jury drawing, the parties agreed that the statutory claims would be tried by the Court. The following exchange then occurred:

> THE COURT: [The statutory claims are] a Court matter. So I don't know whether we are going to do it separately or on the evidence as presented later on.
>
> MR. HEMLEY: I would suggest, your Honor, that much of the evidence upon which you would make that judgment will be duplicative of what the jury will necessarily hear. The most efficient thing would be for us to put all the evidence in and for the Court to make its decision based on the same evidence as the jury hears.
>
> MR. CHEESEMAN: I agree with that.

*See* Transcript of Pretrial Motions, March 2, 1993, at 2–3. Based on this discussion, the Court must conclude that the parties intended that all evidence be presented at trial. Consequently, in addressing Hampden's statutory claims, the Court will only consider evidence presented at trial.

### D. *Hampden's claims under CERCLA and VWMA*

In addressing Hampden's CERCLA claims, the Court will first determine liability and then proceed to "the more complicated questions implicated in clean-up measures, which includes fixing the proportionate fault of liable parties." *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2nd Cir.1993); *see also Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667–68, *corrected, clarified, reh'g denied*, 889 F.2d 673 (5th Cir.1989) ("[C]ourts have bifurcated the liability and remedial, or damages, phases of CERCLA litigation.... In doing so, disputed factual and legal issues pertaining only to liability are resolved before deciding the more complicated and technical questions of the appropriate cleanup measures and the proportionate fault of liable parties.").

### 1. Prima facie case of liability

To establish a prima facie case of CERCLA liability Hampden must show that: 1) the Folinos and/or Folino Industries is a responsible party pursuant to 42 U.S.C. § 9607(a)(1–4); (2) that the Essex Junction site is a "facility" as defined by 9601(9); (3) that there was either a release or threatened release of hazardous substances at the facility; (4) that Hampden incurred response costs in connection with the release; and (5) that the costs incurred were consistent with the National Contingency Plan. *See General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 285 (2nd Cir.1992); *see also Alcan*, 990 F.2d at 719–20.

#### a. *Responsible party*

■ "[A]ny person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of...." is a responsible party pursuant to 42 U.S.C. § 9607(a)(2); *see also* 10 V.S.A. § 6615(a). Based on the evidence presented at trial that hazardous contamination occurred during the Folinos' ownership and Folino Industries' occupation of the Essex Junction site, the Court concludes that the Folinos and Folino Industries are responsible parties.

#### b. *Facility*

The Essex Junction site is a "facility" as that term is defined pursuant to 42 U.S.C. § 9601(9).[5]

#### c. *Release or threat of release*

The 1981 Aquatec Report and the subsequent environmental reports indicate that

---

5. 42 U.S.C. § 9601(9) reads as follows:
The term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located....

there was a "release or threat of release" of hazardous chemicals at the Essex Junction site.

#### d. *Hampden incurred response costs*

■ Response costs encompass removal and remedial actions. 40 C.F.R. § 300.5. "Removal" actions include monitoring and investigating a site, even when no further clean-up occurs. *See* 42 U.S.C. § 9601(23) ("The terms 'remove' or 'removal' means ... such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances...."); 40 C.F.R. § 3.00.5; *see also Carlyle Piermont Corp. v. Federal Paper Board Co.,* 742 F.Supp. 814, 821 (S.D.N.Y.1990); *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 795 (D.N.J.1989). The same rationale applies under the Vermont statute, 10 V.S.A. § 6615(a)(4)(B).

The facts indicate that Hampden incurred costs of monitoring and investigating the site. These are considered response costs.

#### e. *Costs Consistent with National Contingency Plan*

■ A private party response action will be considered consistent with the National Contingency Plan if it is in "substantial" compliance with the plan. *See* 40 C.F.R. § 300.700(c)(3)(i).[6] Based on the evidence presented at trial, Hampden appears to have been in substantial compliance with the site inspection requirements of the National Contingency Plan. *See* 40 C.F.R. § 300.420(c) (remedial site evaluation requirements). We further note that compliance with the National Contingency Plan is not required under the Vermont statute. *See* 10 V.S.A. § 6615(a)(4)(B).

Consequently, we conclude that the Folinos and Folino Industries are prima facie liable under CERCLA and the VWMA. However, we also note our agreement with plaintiffs' observation that Hampden shares liability for these cleanup costs insofar as the evidence at trial showed that contamination

also occurred during Hampden's operation of the Essex Junction site. Therefore, all of the parties to this case are prima facie liable for the response costs. Our task now is to apportion that liability.

### 2. **Apportionment of clean-up costs**

■ Both parties cite case law concerning "divisibility," a principal used to mitigate the potentially harsh effects of joint and several CERCLA liability. The Folinos contend that responsibility for contamination of a site is "divisible" where there is a reasonable basis for dividing responsibility according to the contribution of responsible parties. In support of this proposition, they cite several cases including *O'Neil v. Picillo,* 883 F.2d 176, 179 (1st Cir.1989) (cost recovery action brought by the State of Rhode Island), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *United States v. Monsanto Co.,* 858 F.2d 160, 171 & n. 29 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); and *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802, 809–811 (S.D.Ohio 1983). Hampden, on the other hand, urges us to use a more stringent test of divisibility articulated by the Second Circuit in *Alcan,* 990 F.2d at 722 (2nd Cir.1993) (cost recovery action brought by the U.S. and the State of New York).

Initially, the Court notes that in the above cases, courts were using divisibility to determine whether private parties could avoid joint and several liability in cost recovery actions brought by state and federal agencies. We see a distinction between these types of government actions and the present action which was brought by private parties.

In government cost recovery actions, public policy favors efficiency and full recapture of government expenditures, even if that means one responsible party pays more than its fair share. In furtherance of these goals, courts appear to have made it difficult for liable parties to evade joint and several liabil-

---

**6.** 40 C.F.R. § 300.700(c)(3)(i) reads in pertinent part as follows:

A private party response action will be considered consistent with the NCP' if the action,

when evaluated as a whole, is in substantial compliance with the applicable requirements ... of this section, and results in a CERCLA-quality cleanup[.]

ity. For example, the burden is on the polluter to show divisibility in a government cost recovery action. *See e.g. Alcan,* 990 F.2d at 722 (holding that the polluter bears the burden of showing divisibility, and "[t]he government has no burden of proof with respect to what caused the release of hazardous waste and triggered response costs."); *see also O'Neil,* 883 F.2d at 178–179 ("The practical effect of placing the burden on defendants has been that responsible parties rarely escape joint and several liability....").

This action, between two liable parties, appears to be appropriately treated as one for contribution. *Amoco Oil,* 889 F.2d at 672 ("When one liable party sues another to recover its equitable share of the response costs, the action is one for contribution, which is specifically recognized under CERCLA."). One court has noted that the right of contribution "softens the blow where parties cannot prove that the harm is divisible...." *O'Neil,* 883 F.2d at 179.

In allocating response costs between private parties, the Court may consider equitable principals. *See* 42 U.S.C. § 9613(f)[7]; *International Clinical Laboratories, Inc. v. Stevens,* 710 F.Supp. 466, 471 (E.D.N.Y.1989) (purchaser suing vendor and vendor's former tenant) ("[E]quitable principals may come into play if the Court chooses to consider them when exercising its discretion to apportion responsibility for response costs."); *Smith Land & Improv. Corp. v. Celotex Corp.,* 851 F.2d 86, 90 (3d Cir.1988) ("CERCLA expressly conditions the amount of contribution on equitable considerations."), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989).

Equitable factors that may be considered include " 'the amount of hazardous substances involved; the degree of toxicity or hazard of the materials involved; the degree of involvement by parties in the generation, transportation, treatment, storage, or disposal of the substances; the degree of care exercised by the parties with respect to the substances involved; and the degree of cooperation of the parties with government officials to prevent any harm to public health or the environment.' " *Amoco Oil,* 889 F.2d at 672–3 (quoting Amendments Report, pt. III, at 19, *reprinted in* 1986 U.S.Code Cong. & Admin.News at 3042). Courts have also considered "the circumstances and conditions involved in the property's conveyance...." *Id.; see also Purolator Products Corp. v. Allied–Signal Inc.,* 772 F.Supp. 124, 134–135 (W.D.N.Y.1991) (listing factors to be considered in allocating costs).

In light of the following equitable considerations, the Court finds that Hampden is not entitled to recover its response costs under CERCLA or the VWMA. Preliminarily, we note that both Hampden and the Folinos distributed hazardous chemicals at the Essex Junction site. Many of the same chemicals were kept on site by the parties. The evidence also showed that both parties used poor handling practices on the site.

Furthermore, the Court is persuaded that chemicals present on the site in 1981, during the time the Folinos used the site, had largely migrated off the site via the groundwater by 1987.[8] Even though some response costs were incurred as a consequence of the 1987 disclosure of the early contamination, Hampden's continuing contamination of the site also contributed to the response costs.

Finally, Hampden's failure to disclose the initial Aquatec report during the lease negotiations persuades us that Hampden should not recover its response costs. After receiving knowledge of contamination, Hampden proceeded to lease the site and to operate a chemical redistribution business there. Hampden did not disclose the contamination

---

7. 42 U.S.C. § 9613(f)(1) reads in part as follows: In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

8. At trial, both parties presented expert evidence regarding the source of the chemical contamination present on the site. The Folinos, by way of Dr. Bernard Franks, presented evidence that any contamination that had occurred prior to 1981, when Hampden took over the site, probably migrated off the site through the groundwater by 1987. Conversely, Hampden's expert, Joanne Morin, testified that most of the contamination on the site was the result of activity prior to 1981 and that it was unlikely that the contamination had migrated off the site.

to the Folinos or to government authorities until 1986.

Hampden's concealment of the contamination does not comport with the goals of the federal or the state environmental statutes. Furthermore, Hampden's failure to disclose the report made it impossible to determine which of these parties caused contamination that was on the site in 1987. It would be inconsistent with the goals and purposes of CERCLA and VWMA to permit Hampden to recover under this statute in light of its conduct.

Therefore, the Court holds that Hampden is not entitled to recover its response costs from the Folinos or from Folino Industries. In view of this conclusion, the Court need not consider Hampden's claims for attorney's fees and prejudgment interest.

## II. *The Folinos' claim for attorney's fees*

Pursuant to the lease agreement, the Folinos seek to recover attorney's fees totalling $142,674.87. Hampden appears to agree that the hourly rate charged by the Folinos' counsel is reasonable. Nevertheless, Hampden claims that the Folinos are not entitled to attorney's fees for work done: 1) defending against Hampden's counterclaims; 2) cooperating with Vermont's Agency of Natural Resources ("ANR"); or 3) pursuing their claim for attorney's fees. Hampden also claims that fees connected with recovering building repairs were not reasonable in light of the jury's award.

■ First, the Folinos counter that fees incurred in connection with the defense against Hampden's counterclaim are indistinguishable from fees incurred in pursuing their claims under the lease agreement. Initially, we note that fees incurred in defending against Hampden's counterclaim are not recoverable. Nevertheless, we agree with the Folinos that the attorney's fees spent on the counterclaims up to and during the trial are indistinguishable from claims made under the lease. However, fees incurred since the trial

that are related to Hampden's counterclaims are excluded.

■ Second, the Folinos contend that they are entitled to receive attorney's fees for their work with the ANR pursuant to Paragraph 29 of the lease, which specifies that money spent by the landlord to perform tenant's obligations under the lease shall be considered "additional rent." In light of the jury's conclusion that the costs of cooperating with Vermont's Agency of Natural Resources were caused by Hampden's contamination, the fees incurred as a result constitute "additional rent" and are therefore compensable.

Third, professional fees incurred since the jury trial are not compensable insofar as they relate to recovery of attorney's fees. *See Mt. Everest Ski Shops, Inc. v. Nordica USA, Inc.,* 736 F.Supp. 523, 529 (D.Vt.1989).

Finally, with regard to fees incurred in connection with recovering the building repair costs, the Folinos argue that there is no rule of proportionality. As a matter of discretion, the Court declines to reduce the attorney's fees incurred in connection with the building repairs.

To summarize, the Court awards the Folinos fees incurred through the jury trial, but denies the request for fees incurred since the trial on the grounds that they pertain either to defense against Hampden's counterclaim or to the Folinos' own request for attorney's fees. Consequently, the total award of attorney's fees is $120,876.33.[9]

### *CONCLUSION*

The counterclaims of Hampden Color and Chemical Co. are hereby DISMISSED with prejudice. The Folinos are awarded attorney's fees of $120,876.33.

SO ORDERED.

---

9. This figure represents the total of the $91,875.36 for work done for the period 1/2/91 through 3/10/93 detailed in the affidavit of Martin K. Miller and the $31,024.97 for work done for the period 2/24/87 through 12/31/91 detailed

in the affidavit of Philip H. White minus $2,024.00 for the CERCLA specific work of Norman Williams referenced in the April 22, 1993 letter from Robert Hemley to William Cheeseman.